IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2019

## JOSHUA TERRON JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 110716      Steven W. Sword, Judge**

### No. E2018-01785-CCA-R3-PC

The Petitioner, Joshua Terron Johnson, appeals the Knox County Criminal Court's denial of his petition for post-conviction relief from his 2014 convictions for facilitation of attempted first degree murder, employing a firearm during the commission of a dangerous felony, unlawful possession of a weapon, and aggravated assault and his effective sentence of twenty-six years. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Joshua Terron Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Phillip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Petitioner's convictions relate to the August 10, 2013 shooting of Nathan Kelso. The victim survived his injuries, and the Petitioner and his codefendant, Bendale Romero, were tried jointly. This court affirmed the Petitioner's convictions and summarized the facts of the case as follows:

> The State's first witness was Michael Alan Mays. Mr. Mays testified that he was the records manager for the Knox County Emergency Communications District (9-1-1). Mr. Mays said that the first 9-1-1 call regarding the shooting of the victim occurred at 1:05 a.m. on August 10, 2013.

The State played five 9-1-1 calls for the jury, which we have summarized as follows:

(1)     A woman reported hearing seven gunshots in Lonsdale Homes.

(2)     A woman reported hearing gunshots for fifteen minutes in a parking lot in Lonsdale Homes. She saw a black car and said that she did not want to look out her door.

(3)     A woman reported hearing a lot of gunshots and a man begging for his life. She believed it happened in parking lot C.

(4)     A man reported hearing ten to fifteen gunshots and believed someone was shot. He reported that the shooting occurred at Pascall and Minnesota in Lonsdale. He saw people running.

(5)     A man reported that someone had been shot behind Minnesota Avenue. He reported that the shooter was a short, light-skinned black man who drove a maroon vehicle.

. . . Henry Wilson . . . [testified] that he lived in Lonsdale Homes and showed, on an aerial map, where his home was in relation to parking lot C. Mr. Wilson testified that on August 10, 2013, just as he was lying down to go to sleep, he heard two gunshots followed by someone "hollering, moaning and groaning." He further testified that the person said, "[D]on't do this to me," and "[Y]ou know me." Then, he heard two more shots. Mr. Wilson said that he looked outside and saw someone drive away, but without his glasses on, he was unable to recognize the person. Mr. Wilson went outside to the victim, who was near the trash cans in parking lot C, and saw that the victim was wounded in his legs and head. Mr. Wilson testified that the other bystanders told him who had shot the victim. When police officers arrived, Mr. Wilson told them that "Little B" was the shooter and told them where "Little B" was located. Mr. Wilson identified "Little B" as Bendale Romero.

Michael L. Tillery testified that on August 10, 2013, he was in bed asleep when he heard arguing outside his home in Lonsdale Homes. He looked out the window but could not see well without his glasses. When he

-2-

turned to get his glasses, he heard gunshots. He saw someone drive away. Mr. Tillery said that he called 9-1-1 and also spoke with police officers who arrived thereafter.

On cross-examination, Mr. Tillery said that he heard the victim say, "'[M]an, we're better people than that[.]'" Mr. Tillery denied telling police that the shots were fired from the car and stated that he did not remember telling police that "Little B" was the person who said, "'[W]e're better people than that.'" He said that the shots were spaced apart—first two and then a third. Mr. Tillery also stated that the car that drove away was red and that the victim had been arguing with someone in the red car.

Knoxville Police Department Officer Jacob Wilson testified that he patrolled the area in and around Lonsdale Homes. He was dispatched to Lonsdale Homes on August 10, 2013, after residents had reported shots being fired. When Officer Wilson arrived in lot C, he heard someone yelling for help on the other side of the parking lot. He ran to the victim and saw that the victim had been shot in his temple. Officer Wilson said that the victim was grabbing his pants leg and calling for someone to help him. Officer Wilson testified that despite his knowing the victim personally, he could not recognize the victim due to the victim's injuries. Officer Wilson had a conversation with the victim before the victim went to the hospital. He also talked with bystanders. As a result, he went to the apartment where he believed codefendant Romero lived. Codefendant Romero's mother allowed Officer Wilson into the apartment and showed him to Romero's bedroom. Romero's window was open and wet grass was scattered on his bed. Officer Wilson learned that the shooting suspect was supposedly driving a maroon two-door car, and a car matching that description was found in a yard nearby, "pulled in . . . like it was hidden."

On cross-examination, Officer Wilson testified that Michael Tillery told him that he heard two shots, went to his window or door, and observed a "vehicle move closer to [the victim]." Mr. Tillery also told Officer Wilson "that he heard [the victim] plead for his life, or . . . , please don't shoot me again, and they said, man, we're better people than that[,] and then shot again." Officer Wilson said that Mr. Tillery attributed the shooter's statement to "Little B."

The victim, Nathan Kelso, testified that he was from Knoxville and grew up in the Lonsdale area. When asked whether he recognized anyone at the defense table, he said that the person who shot him was the person wearing a yellow button-up shirt and that he also recognized the person wearing black

pants and a white button-up shirt as being from Lonsdale. The person with the yellow shirt was identified for the record as codefendant Romero, and the person wearing the white shirt was identified for the record as appellant. The victim testified that on August 10, 2013, he purchased marijuana and went to Lonsdale with a friend whose name he could not remember to trade the marijuana and a small amount of cash for crack cocaine. When he arrived at Lonsdale, he saw that "the boy Josh had a gun out on two other fellows." The victim said that after that situation was resolved, he approached "him," presumably "Josh," and asked "if he would trade off on something that I had." The victim testified, "[H]e turned around and said, f*** that, pow, shot me in my leg for no reason." The victim said that he asked him what he was doing and "what the f*** is wrong with you," but when the victim tried "to swing" his arm, the man "shot [him] in [his] arm." The victim then stated

> After he shot me in my arm, I went over to the other side to the ground. When I got to the ground, I never seen the other little guy all the time I was out there. And I heard Josh myself, come on, man, shoot him in the head, shoot him in the head. I remember him saying, shoot me in the head. He put the gun to my forehead, it didn't go off. So he pushed me back to the ground, fixed the gun, and I put my hand up when it went to my (sic) gun, he shot me in my head.

The victim identified the man in the yellow shirt (codefendant Romero) as the person who shot him in the head. The victim said that he had known "Josh" since Josh was a baby and that he had known of the man in the yellow shirt since he was young, as well. The victim showed the places where he had been shot, and he explained that the bullet that hit his head first went through his hand and was still lodged behind his eye. He said that the men got into a [Camaro] driven by the man in the yellow shirt. The victim explained that he was unable to remember names.

Regarding the effect that the shooting had on his body, the victim testified as follows:

> I can't remember certain foods . . . the name of them. I've gotta look at it again and then I can remember what it is. Still, names – you know, people I know if I see – when I see them – I see people I know who they are. I just can't remember names. There's just things I can't do like I used to do – working status and stuff like that . . . . I can't hear in my left ear[.] . . .

My eyesight, I've just gotta . . . keep it dripped to where it stays watered down, you know, wet. I can't chew on my left side, my food. . . . I have a ringing in my ear. . . . My ringing lasts forever. . . .

The victim identified a photographic lineup and recalled that the lineup was given to him when he was in the hospital. It was dated August 17, 2013, and he had circled the photograph of the man who shot him in the head. He again identified the man in the courtroom wearing a yellow shirt as the man who shot him in the head. The victim identified a second photographic lineup that was shown to him in the hospital. He said that the person he circled was the man who shot him in the leg and arm. The second photographic lineup was dated August 18, 2013. The victim testified that the man in the courtroom wearing glasses was the person who shot him in the leg and arm. The State identified that person for the record as appellant.

On cross-examination, the victim testified that he had $60 in cash and $50 worth of marijuana when he approached appellant. He agreed that he knew appellant had a firearm. The victim denied that he was trying to steal appellant's drugs. He affirmed that the person who walked to Lonsdale with him would have been present for at least the first gunshot. The victim agreed that appellant could have killed him and stated, "He talked someone into killing me because I (inaudible)." On re-direct examination, the victim confirmed that he told the police on August 17 and August 18 that there were two shooters and that he testified at the preliminary hearing that there were two shooters.

Lisa Knight, the director of the handgun program with the Tennessee Department of Safety and Homeland Security, testified that codefendant Romero did not have a handgun carrying permit and that it would be illegal for a person with a felony drug conviction to possess a handgun.

The State presented evidence from medical personnel at the University of Tennessee Medical Center regarding the victim's medical treatment and records. Thereafter, the State rested its case-in-chief.

Codefendant Romero testified in his own defense. He stated that on the night of the shooting, the victim approached him in parking lot C about "sell[ing] him some." Codefendant Romero said that he did not sell him anything but continued on his way to throw out his trash in the parking lot dumpster. When he returned from the dumpster, the victim "tried to strong

-5-

arm [him] and go in [his] pockets." Codefendant Romero stated that he and the victim struggled, and Romero's gun fell off of his hip. He said, "[S]o when I finally shook him off of me and got free from him, I dive, and when I got to the gun, I just was scared, and I pointed it at him and started squeezing." Codefendant Romero then ran to his car while shooting back at the victim, got into his car, and drove behind his apartment. He said that he threw away the gun in a creek at a park. Codefendant Romero said that he had a previous encounter with the victim one to two weeks before the shooting during which the victim tried to "bully[]" him for money. He stated that he was not trying to kill the victim.

On cross-examination by appellant's attorney, codefendant Romero testified that appellant was not present during the shooting. Codefendant Romero then rested his case-in-chief, and appellant rested his case without presenting evidence.

*State v. Joshua Johnson*, No. E2015-00545-CCA-R3-CD, 2016 WL 297886, at *1-4 (Tenn. Crim. App. Jan. 25, 2016), *perm. app. denied* (Tenn. June 23, 2016).

The Petitioner filed the instant petition for post-conviction relief, alleging that trial counsel provided ineffective assistance by failing to explain adequately the risks of electing not to testify at the trial when the victim and the Petitioner were friends and when the victim identified the Petitioner as "one of the two people who . . . shot [the victim]."

At the post-conviction hearing, the Petitioner testified that he and trial counsel met before the trial and that they discussed the discovery materials. The Petitioner said that he knew the victim would testify at the trial but that he did not know the victim would identify him as the shooter. The Petitioner said that he and counsel decided that he would "plead innocent" but that counsel advised the Petitioner that codefendant Romero's trial counsel would "make [the Petitioner] out to be this monster" because the Petitioner's juvenile court record showed an adjudication for first degree felony murder. The Petitioner agreed counsel advised that the State could impeach the Petitioner with the adjudication if the Petitioner testified at the trial. The Petitioner said, though, he was concerned about the impact of not testifying. The Petitioner said that counsel stated the decision to testify belonged to the Petitioner but that counsel advised the Petitioner against testifying.

The Petitioner testified that trial counsel's investigator visited him at the jail and played a recording of the victim's statement. The Petitioner said that on the day of the trial but before it began, counsel reported that codefendant Romero intended to testify that the Petitioner was not present during the shooting and knew nothing about the shooting. The Petitioner said that counsel's response to the information was to "see how it plays out." The

-6-

Petitioner said that before he learned codefendant Romero intended to testify, the Petitioner had been "leaning toward" not testifying because of counsel's advice relative to the Petitioner's juvenile history. The Petitioner denied that he and counsel discussed any negative inferences a jury might have drawn if only codefendant Romero testified. The Petitioner recalled that counsel believed Mr. Romero's testimony would benefit the Petitioner and continued to advise against the Petitioner's testifying.

The Petitioner recalled that the victim testified at the trial that the victim and the Petitioner had known each other for a long time and that the Petitioner shot the victim multiple times. The Petitioner denied shooting the victim. The Petitioner said that after the victim's testimony and the State's case-in-chief, trial counsel continued to advise against the Petitioner's testifying based upon the juvenile adjudication for first degree felony murder. The Petitioner said that although he knew it was his decision whether to testify, counsel provided him with an ultimatum that "if I get up here and do that, this is what [the prosecutor is] going to bring up." The Petitioner said that if he had testified, he would have proclaimed his innocence and told the jury he was not at the scene when the shooting occurred. He said that he did not have "personal knowledge" of who shot the victim because he was not at the scene but that he learned later from the 9-1-1 recordings that codefendant Romero and someone with the last name "Young or something like that" were involved. The Petitioner did not know whether the victim attempted to "rob someone of marijuana." The Petitioner agreed his defense was not self-defense and said his only defense was that he was not present during the shooting, which he said was consistent with the 9-1-1 calls and codefendant Romero's trial testimony. The Petitioner said he would have testified if it had not been for his first degree felony murder adjudication.

The Petitioner testified that he did not have any concerns about the jury's knowing codefendant Romero would testify but that the Petitioner would not testify. When asked if his testimony would have helped his defense, the Petitioner said that he was unsure how the jury would have reacted to his first degree murder adjudication. He said that he admitted his culpability in juvenile court because he had committed the offense. The Petitioner said that if he had known at the trial what he knew at the post-conviction hearing, he would have elected to testify at the trial and noted that the jury "believe[d] something" because the jury convicted him of facilitation of attempted first degree murder, which was a lesser included offense of attempted first degree murder.

On cross-examination, the Petitioner testified that he had a previous felony conviction for possession with the intent to sell cocaine and acknowledged that the conviction could have been used to impeach his credibility if he had testified at the trial. He denied that trial counsel had advised him this conviction could have been used for impeachment purposes.

-7-

The Petitioner testified that he told trial counsel that he was not at the scene at the time of the shooting and that this was the defense he wanted counsel to present. He agreed that he wanted to testify at the trial but that he decided not to testify because of his previous record based upon counsel's advice. The Petitioner said that, at the time of the shooting, he was at the home of Sherita Payne, whom he identified as the mother of his child, and that he provided her name to counsel. The Petitioner agreed that Ms. Payne did not testify at the trial and that she was not present for the post-conviction hearing. The Petitioner said that he also provided counsel information about Cornell Freeman, whom he identified as the person who gave a statement on the night of the shooting. The Petitioner agreed that Mr. Freeman was not present at the post-conviction hearing.

The Petitioner testified that, during the trial, he told the trial court that he did not want to testify. He agreed that codefendant Romero had testified that the Petitioner was not present during the shooting. On redirect examination, he stated that he and counsel never discussed seeking to prohibit the State from using the juvenile adjudication as impeachment evidence.

Trial counsel testified that he and the Petitioner reviewed the discovery materials, the facts the defense needed to establish, and whether the Petitioner wanted to testify at a trial. Counsel said that he and his investigator went to the scene and that counsel ensured the defense had all of the relevant information. Counsel said that he hoped to show at the trial that the victim was a "liar."

Trial counsel testified that he advised the Petitioner to testify at the trial because the Petitioner had stated he was not at the scene during the shooting but that he also advised the Petitioner the previous felony conviction and juvenile adjudication could be used for impeachment purposes. Counsel said, though, that he told the Petitioner that the decision whether to testify belonged to the Petitioner. Counsel recalled that the State filed a notice to impeach the Petitioner with his previous drug-related conviction and juvenile adjudication for felony murder and to seek an enhanced sentence if convicted. Counsel said that his and the Petitioner's discussion about whether the Petitioner should testify spanned "a long period of time."

Trial counsel testified that although he and the Petitioner were unsure what codefendant Romero would do at the trial, counsel spoke with codefendant Romero's attorney a couple of days before the trial and that counsel understood codefendant Romero intended to testify that the Petitioner was not at the scene. Counsel said that, after codefendant Romero testified, counsel advised the Petitioner to testify because counsel believed the "best thing" was for the Petitioner to confirm codefendant Romero's testimony. Counsel believed two witnesses testifying that the Petitioner was not at the scene was better than the victim's testimony that the Petitioner shot the victim. Counsel agreed that the

Petitioner ultimately decided not to testify and that, after the Petitioner declined to testify, the trial court told the Petitioner that the court would allow the Petitioner to testify if the Petitioner changed his mind. Counsel said that he and the Petitioner continued discussing whether the Petitioner should testify after the *Momon* hearing but that the Petitioner chose not to testify.

Trial counsel testified that the Petitioner did not state his reasons for deciding not to testify. Counsel believed, though, that the Petitioner did not want to "disturb" codefendant Romero's testimony. Counsel said that the State could have questioned the Petitioner about codefendant Romero's conduct and that counsel expected the Petitioner's testimony would have been that the Petitioner did not know anything because he was not at the scene. Counsel did not know whether the jury would have believed the Petitioner. Counsel said that the Petitioner understood his rights throughout the trial proceedings.

On cross-examination, trial counsel testified that he and the Petitioner did not discuss whether the trial court might prohibit the State from questioning the Petitioner about the felony murder adjudication. Counsel said, though, that he and the Petitioner discussed whether the jury might have been concerned about the Petitioner's not testifying if codefendant Romero testified. Counsel said that although they discussed the concerns multiple times before and during the trial, the decision belonged to the Petitioner.

Trial counsel testified that although the Petitioner informed counsel of the Petitioner's potential trial testimony, counsel did not recall the Petitioner's providing the names of potential alibi witnesses. Counsel said, though, that if the Petitioner had provided names of potential witnesses, counsel and his investigator would have attempted to contact them.

The post-conviction court denied relief. The court credited trial counsel's testimony that he advised the Petitioner to testify at the trial. The court found that the trial judge explained to the Petitioner that regardless of counsel's advice, the decision to testify belonged to the Petitioner. The court found that counsel and the Petitioner reviewed the evidence and that counsel advised the Petitioner to testify before and during the trial.

The post-conviction court determined, though, that trial counsel should have sought a pretrial ruling regarding the admissibility of the Petitioner's juvenile adjudication for first degree felony murder after the State filed a notice to impeach the Petitioner with the adjudication. The court found that if counsel had filed a pretrial motion seeking to preclude the State from impeaching the Petitioner with the adjudication, the Petitioner's decision whether to testify might have been different. The court determined, though, that even if the prosecutor had been prohibited from mentioning the adjudication, the outcome of the trial would not have been different. The court found that the Petitioner only stated that he would have testified that he was not at the scene when the shooting occurred. The court found that

codefendant Romero testified that the Petitioner was not at the scene during the shooting, which supported the Petitioner's defense, and that the jury's verdict showed it rejected this evidence. The court determined that the Petitioner failed to establish that he had been prejudiced by counsel's deficient performance. This appeal followed.

The Petitioner contends that trial counsel provided ineffective assistance by failing to seek a pretrial ruling on the admissibility of the juvenile adjudication for felony murder. He asserts that because the jury convicted him of a lesser included offense of attempted first degree murder, the jury might have reached a more favorable outcome if it had heard the Petitioner's testimony. The State responds that the post-conviction court did not err by denying relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not

-10-

second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The record reflects that the trial counsel advised the Petitioner to testify at the trial. The chosen defense was that the Petitioner was not at the scene at the time of the shooting, and codefendant Romero's trial testimony supported this defense. The Petitioner stated that although he wanted to testify at the trial that he was not at the scene when the shooting occurred, he chose not to testify because the prosecution intended to impeach him with his juvenile adjudication for first degree felony murder and because he feared how the jury might react to the adjudication. The State filed a notice to impeach the Petitioner with the adjudication and the drug-related felony conviction if he chose to testify at the trial, but counsel did not seek a determination from the trial court before the trial about the admissibility of the adjudication. The record supports the post-conviction court's determination that counsel's failure in this regard was deficient performance.

However, even if trial counsel had filed a motion to prohibit the State from asking about the adjudication and the trial court had granted the motion, evidence that the Petitioner was not present during the shooting was before the jury. Although the victim testified that the Petitioner shot the victim, the remaining witness testimony and the 9-1-1 calls did not place the Petitioner at the scene. In fact, codefendant Romero testified that the Petitioner was not at the scene when the shooting occurred, which supported the chosen defense theory. The jury's verdict, though, reflects that it credited the victim's testimony and rejected evidence that the Petitioner was not at the scene when the shooting occurred. Furthermore, even if the juvenile adjudication for first degree felony murder had been excluded, the Petitioner's previous drug-related conviction could have been used as impeachment evidence. Therefore, the record supports the post-conviction court's determination that the Petitioner failed to establish that any deficient performance resulted in prejudice. The Petitioner is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE